# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STEPHEN P. SUTTON, Ph.D.,<br>199 Byrd Street<br>Troy, North Carolina 27371;<br><br>ELIZABETH H. SUTTON<br>199 Byrd Street<br>Troy, North Carolina 27371;<br><br>and<br><br>WILLIAM THOMAS SUTTON,<br>1215 Kent Road,<br>Raleigh, North Carolina 27606<br><br>     Plaintiffs,<br><br>  v.<br><br>W.L. GORE & ASSOCIATES, INC.,<br>The Corporation Trust, Incorporated<br>2405 York Road, Suite 201<br>Lutherville, Maryland 21093-2264<br><br>     Defendant. | C.A. No.: 1:22-cv-1471<br><br>COMPLAINT AND<br>DEMAND FOR JURY TRIAL |

## COMPLAINT

**NOW COME** the Plaintiffs, Stephen P. Sutton, Ph.D., ("Dr. Sutton"), Elizabeth H. Sutton ("Mrs. Sutton"), and William Thomas Sutton ("Thomas Sutton"), (collectively "the Suttons" or "Plaintiffs"), by and through the undersigned counsel, and complaining of the Defendant, W.L. Gore & Associates, Inc., ("Gore" or "Defendant"), hereby allege and state as follows:

### THE PARTIES

1. Plaintiffs Dr. Sutton and Mrs. Sutton are citizens and residents of Montgomery County, North Carolina. Plaintiff Thomas Sutton is a citizen and resident of Wake County, North Carolina.

1

2.      W.L. Gore & Associates, Inc., is a Delaware corporation that identifies its principal place of business as 555 Paper Mill Road, Newark, Delaware 19711.  Defendant Gore is authorized to conduct business within the State of Maryland. Defendant Gore's registered agent for service in the state of Maryland is: The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville, Maryland 21093-2264.

3.      Gore is the owner and operator of an industrial property, comprised   of approximately 20.78 acres of improved real property located in Elkton, Maryland with a mailing address of 2401 Singerly Road, Elkton, Maryland 21921 (the "Cherry Hill Facility" or "Cherry Hill").

4.      Gore is a privately held, multinational manufacturing and materials science company specializing in the development of membrane and polymer and fluoropolymer products, as well as their manufacture and application to a variety of industries and sectors, including healthcare, life sciences, mobile electronics, automotive, textiles and apparel, and aerospace. This includes "Gore-Tex" fabric.

5.       According to Gore's website:

At Gore, we believe that the integrity of environmental, health and safety performance aligns with our Gore brand promise of *Together, improving life* for all Gore Associates, customers and the communities we serve. We carefully consider the effects of our products and operations on the environment, as well as on the health and well-being of people. We are committed to using our materials science expertise to create products that improve the quality of life and address sustainability challenges for generations to come. Our expectation is that the value of our innovations is greater than the environmental and social impact of our products and operations.[1]

---

[1] https://www.gore.com/about/the-gore-story?view=responsible-enterprise.

6.     Gore employs, upon information and belief, approximately between 250 and 300 people at the Cherry Hill Facility.

7.     At all times relevant to the facts and allegations set forth herein, Gore: (a) maintained licenses and registrations to do business in the state of Maryland; (b) regularly conducted business in the State of Maryland; (c) maintained continuous and systematic contacts with the State of Maryland; (d) committed acts and/or omissions within the State of Maryland which gave rise to the instant action; (e) injected their products and/or materials into the stream of commerce within the State of Maryland; and/or (f) acted as one entity with a parent or subsidiary which, at all times relevant to the facts and allegations set forth herein, had continuous and systematic contacts with the State of Maryland.

## JURISDICTION AND VENUE

8.     The state law claims asserted in this Complaint are brought pursuant to Maryland common law.

9.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1), because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000.

10.    This Court has personal jurisdiction over Defendant, as it caused tortious injury in the State of Maryland, performed acts or omissions within the State of Maryland which caused such tortious injury, regularly conducts and/or solicits business within the State of Maryland, engages in other persistent courses of conduct in the State of Maryland, and/or derives substantial revenue from goods, services, and/or manufactured products used and consumed within the State of Maryland.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Gore is considered a resident of the State of Maryland, under 28 U.S.C. § 1391 (c)(2) as an entity over which this Court has personal jurisdiction. Venue is further proper under 28 U.S.C. § (b)(2), because Gore the events and/or omissions giving rise to the claims occurred in Maryland, and the property which is the subject of the action is situated in Maryland.

## JURY DEMAND

12.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

## GENERAL FACTUAL ALLEGATIONS

### Background Regarding PFOA, APFO and Use in the Creation of Gore's PTFE and ePTFE

13.     Polymers are substances with molecular structures consisting chiefly, or entirely, of large numbers of similar units bonded together, such as synthetic organic materials used as plastics or resins.

14.     Fluoropolymers are fluorocarbon-based polymers with multiple carbon fluorine bonds, which are characterized by a high resistance to solvents, acids, and bases, making them ideal for use in waterproof products, such as Gore-Tex fabric.

15.     Many of Gore's most important and lucrative products are based on a fluoropolymer called polytetrafluoroethylene ("PTFE"), otherwise known as Teflon®, which Gore uses to create thousands of different products and applications.

16.     In connection with Gore's PTFE manufacturing processes, it processes materials comprising dangerous per- and polyfluoroalkyl substances ("PFAS") and in some cases uses and has used dangerous toxic PFAS compounds in its manufacturing processes.

17.     PFAS are a large group of over four thousand (4,000) chemical compounds, including but not limited to ammonium perfluorooctanoate ("APFO"), perfluorooctanoate ("PFO"), perfluorooctanesulfonic acid ("PFOS"), and perfluorooctanoic acid ("PFOA"), colloquially known as ("C8").

18.     PFAS are human-made chemicals that are not found in nature. PFAS, including APFO in particular, are highly water-soluble and easily dissolve into rainwater and other precipitation that readily percolates down to contaminate groundwater.

19.     Due to their chemical structure, PFAS are biologically and chemically stable in the environment and resistant to environmental degradation processes, and thus remain present in the environment long after they are initially released.

20.     PFAS bioaccumulate in living organisms, primarily in the blood serum, kidney, and liver, and remain in the human body.

21.     PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to as per- and polyfluoroalkyl substances (PFAS) or perfluorochemical compounds (PFCs). This group of compounds also includes perfluorooctane sulfonic acid (PFOS).

22.     PFOA and all PFCs are human-made chemicals that are not found in nature. The ammonium salt form of PFOA, APFO, is highly water soluble and its particulate matter quickly and easily dissolves into rainwater and other precipitation to form PFO- or PFOA, which then readily percolates down through soils to contaminate groundwater.

23.     APFO is the ammonium salt form of PFOA. It dissociates in water to form PFO⁻ is protonated to form PFOA.[2]

---

[2] For purposes of this Complaint, APFO, PFO and PFOA will all be generically referred to as "PFOA".

24.     APFO acts as a "surfactant" or "emulsifier"—a chemical additive which is used to create high molecular weight PTFE, and which enables the PTFE particles to be suspended in water.

25.     Generally, surfactants and emulsifiers like APFO are chemical compounds that act as wetting agents, lowering surface tension between gasses and liquids and reducing the volatility of chemical reactions, thereby allowing for chemical reactions which are otherwise difficult to achieve. These are mixed with large reactor vessels or basins to form PTFE.

26.     APFO, introduced as the surfactant/emulsifier, takes the physical form of a white powder/white solid at ambient temperature. When added to water, it takes the form of a soapy, detergent-like liquid, utilized in the process of creating PTFE. This process is called aqueous dispersion polymerization.

27.     When APFO is released to the environment and interacts with  aqueous solution into the environment, it undergoes an immediate chemical reaction which converts it to PFOA. When APFO enters the human body, such as via inhalation of APFO air emissions, a similar chemical reaction occurs.

28.     APFO/PFOA exists as a vapor when heated during the process of PTFE manufacturing and coating. When PTFE coatings are heated, APFO/PFOA vaporizes out of the PTFE dispersion and exits through stacks in manufacturing facilities. When hot PFOA vapor exits through the stacks, it cools and coagulates within minutes to form micro-sized particulates ranging from 0.1 μm to 1 μm in diameter that are then carried by the wind until they settle to the ground (dry deposition) or are washed by precipitation (wet deposition).

29.     Gore gained notoriety for its efforts in further stretching and expanding post-extrusion PTFE, thereby orienting the web-like molecules and making the PTFE even stronger and more durable.

30.     Stretched and expanded PTFE is referred to as "ePTFE".

31.     While ePTFE's oriented, web-like structure is ideal for high-strength applications, its porous structure also enables applications involving filtration and breathability.

32.     Moreover, due to its chemical structure, PTFE and ePTFE are biologically and chemically stable and are largely resistant to degradation. Such bio-retentive, bio-accumulative, and bio-persistent characteristics make PTFE and ePTFE ideal components of strong, durable consumer products.

33.     In March of 1995, Gore expanded its prior utilization of APFO in the production of its PTFE and ePTFE, by introducing utilization of an "oligomer" as a solvent for PTFE, in order to enable additional novel PTFE applications, along with a method for measuring and determining PTFE's molecular weight.

34.     An "oligomer" is a molecular complex of chemicals which consists of very few repeating units.

35.     Upon information and belief, the particular oligomer at issue that was introduced, was comprised of post-polymerization PTFE waste scraped from polymerization vessels at a separate PFAS manufacturing facility and recycled for use by Gore.

36.     Upon information and belief, this oligomer was comprised of staggering levels of C8, including approximately 10% raw APFO.

37.     At this time, Gore was well aware of the toxic nature of APFO/PFOA, and that this oligomer contained a substantially higher level of raw PFOA than proportions of surfactants previously introduced and utilized at Gore.

38.     Gore also knew that heating even the smallest quantities of the oligomer in the testing or production process to temperatures appropriate for ePTFE membranes would result in extreme PFOA emissions.

39.     For a period of many years following 1995, Gore directed its employees to purchase large quantities of this oligomer (TE-5039A) to utilize in testing and production.

40.     For a period of many years, Gore directed its employees to perform testing and production processes utilizing the oligomer containing 10% raw PFOA, which resulted in substantial toxic environmental exposures to the surrounding Elkton, Maryland community, including Plaintiffs.

41.     Gore represented to its employees that the oligomer was harmless.

42.     In approximately the fall of 1996, the TE-5039A oligomer was no longer available for purchase by Gore. By information and belief, this was due to the filing and early stages of a lawsuit related to the manufacture of PFAS products. This was known to Gore.

43.     Despite this knowledge, Gore instructed its employees from the fall of 1996 through the year 1997 to continue utilizing the large quantities of the TE-5039A oligomer it had already purchased.

### Toxicity of PTFE and ePTFE products developed with APFO/PFOA

44.     While PTFE and ePTFE possess commercially desirable physical characteristics related to strength and durability, PFOA used in the manufacture of PTFE and ePTFE is highly

carcinogenic and otherwise toxic and/or harmful to human beings (and other living creatures) who inhale, ingest, or otherwise absorb PFOA.

45.     Specifically, PFOA is readily absorbed after ingestion or inhalation exposure, binds to albumen in an individual's blood serum, and is concentrated in the liver and kidneys.

46.     When released into the environment, PFOA is also particularly persistent in water and soil and, because of its solubility in water, can readily migrate from soil to groundwater.

47.     Moreover, due to its persistence to biodegradation, hydrolysis and photolysis and high resistance to virtually all methods of traditional purification and/or eradication, PFOA remains in the environment—and in the human body—long after its initial discharge and/or consumption/absorption.

48.     PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time.

49.     Myriad health risks exist associated with exposure to PFOA, and such risks are present even when PFOA is ingested at, seemingly, very low levels (less than 20.0 part per trillion (ppt)).

50.     Specifically, PFOA is associated, *inter alia*, with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, endometrial/uterine cancer, breast cancer, pancreatic cancer and ovarian cancer, along with thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, low birth weights, endocrine disruption, pregnancy-induced hypertension and other health conditions.

51.     Upon information and belief, PFOA has the ability to cause other cancers and illnesses not yet associated with human exposure.

**History of PFAS Industry use, sale and production of PFOA-containing Products and Knowledge of Toxicity**

52.     Gore began using PFOA in the manufacture of its PTFE products at its Cherry Hill Facility in the late 1970's.

53.     Gore: (a) purchased PTFE resin and aqueous PTFE dispersions containing high amounts of PFOA and/or APFO for use in Gore's manufacturing processes and later (b) created and/or used raw PFOA and/or APFO to create its own PTFE aqueous dispersions and resins for use in manufacturing. Upon information and belief, Gore spent hundreds of millions of dollars to purchase thousands of tons of PTFE resin each year until it began its own production.

54.     When Gore began manufacturing its own PTFE resin, in which it utilized raw APFO as a surfactant or wetting agent, it also sold, traded, and provided PTFE resin to other manufacturers.

55.     Prior to 2015, Gore utilized PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food, and other materials such as cookware that are resistant to water, grease, or stains.

56.     Due to its chemical structure, PFOA is biologically and chemically stable in the environment and is resistant to environmental degradation processes. It is particularly persistent in water and soil and, because PFOA is water-soluble, it can migrate readily from soil to groundwater. PFOA remains present in the environment long after it is initially released.

57.     In 2006, the United States Environmental Protection Agency ("EPA") implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies. The stewardship program's goal was (i) to achieve a 95% reduction of global facility emissions of PFOA and chemicals that degrade to PFOA by 2010, and (ii) to eliminate PFOA from emissions and products by 2015. According to EPA, all eight companies

that participated in the program have attested that they phased out PFOA, and chemicals that degrade to PFOA, from emissions and products by the end of 2015.

58.     There are a number of health risks associated with exposure to PFOA, and these risks are present even when PFOA is ingested at, seemingly, very low levels (0.004 parts per trillion (ppt)).

59.     PFAS manufacturers became aware of the toxicity of PFOA in the 1950s and began researching the potential health effects associated with the compound.

60.     A study published in or about 1961 found that PFAS induced a range of toxic effects, including anesthesia, depression, inhibition of enzymes, metabolic effects, and effects on blood pressure and the sympathetic nervous system.

61.     PFAS manufacturers knew by the 1970s, at the latest, that PFAS were widely present in human blood and were not easily removed from the body or bloodstream.

62.     In 1976, two academic researchers published a report that showed widespread contamination of human tissues in non-occupationally exposed persons with organofluorine compounds (organic compounds that contain the carbon-fluorine bond) which were likely derived from commercial sources such as PFOA. The authors questioned whether consumer products containing these compounds could be the source, but PFAS manufacturers plead ignorance and instructed them not to speculate.

63.     In the late 1970s, the PFAS industry began monitoring the effect of occupational exposure to PFAS on the health of employees working in PFAS manufacturing facilities.

64.     Despite observing indications of ill-health effects in their employees who were exposed to PFAS, PFAS manufacturers agreed not to notify the EPA of these findings under

Section 8(e) of the Toxic Substances Control Act because there were no *established* adverse health effects associated with their findings.

65.     Around the same time, the PFAS industry was conducting studies in laboratory animals that demonstrated dangerous health effects associated with exposure to PFOA, including, but not limited to: 1) liver enlargement and death in rats at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and; 3) liver enlargement and corneal opacity in rats that inhaled doses for only four hours.

66.     By the late 1970s, the PFAS industry was aware of "compound-related effects" (effects related to PFOA) in both Rhesus monkeys and Charles River CD rats, with more severe effects observed in the monkeys, including increased incidences of kidney and liver damage.

67.     By 1979, the PFAS industry was also aware of a 90-day oral study in Rhesus monkeys that had been administered dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

68.     Early PFOA toxicology studies were summarized in 1980 and the liver was highlighted as a target organ, while effects on the immune system were also reported. The study reports were not submitted to the EPA until the year 2000.

69.     In 1980, PFOA animal toxicity studies were published and were accessible to PFAS manufacturers.

70.    By 1980, PFAS manufacturers had internally confirmed that PFOA is toxic and bioaccumulative, and were aware that the rate of first-time myocardial infarctions (heart attacks) in company foreman at at least one PFAS manufacturing facility was almost double what would have been expected.

71.    Materials from a C-8 Communications meeting dated July 31, 1980, stated: "After 25 years of handling C-8, we see no damage among workers. However, the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

72.    By 1981, the PFAS industry was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus. PFOA was found to be present in the umbilical cord blood of an infant born to an employee and in the blood of an infant born to another employee.

73.    By 1981, the PFAS industry was also aware that PFOA ingestion caused birth defects in rats, and had found birth defects in two of seven children born to PFOA exposed workers in at least one PFAS manufacturing facility, both of whom had eye defects.

74.    An experimental study conducted in 1981 showed birth defects in the eye lens of rats exposed to PFOA. A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals, which upon information and belief, prompted PFAS manufacturers to remove all female employees from PFOA-exposed jobs without informing them of the reason for their transfer.

75.    By the early 1980's, PFAS manufacturers were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA with other manufacturers within the industry, but concealed this knowledge from the public at large.

76.     By 1984, the PFAS industry was aware that PFOA in its particulate form was being emitted in high volumes from smokestacks at facilities that used PFAS in their manufacturing processes and deposited in soil throughout the surrounding communities.

77.     Upon information and belief, Dr. Jack Hegenbarth ("Hegenbarth") was an employee and later executive within the PFAs industry, during the years of 1965 to 1989, with not only awareness, but high-level knowledge of the research related to the concerns surrounding the toxic health effects of PFOA.

78.     On or around May 21, 1984, Hegenbarth and others met to review and discuss engineering studies and other evidence showing:

    a.   Aerial PFOA emission amounts from a PFAS manufacturing facility;

    b.   Aqueous PFOA emission amounts from a PFAS manufacturing facility;

    c.   Residual PFOA emission amounts from products manufactured at a PFAS manufacturing facility;

    d.   *Inter alia*, birth defects in unborn animals exposed to PFOA;

    e.   Expected PFOA amounts in the blood of employees working at a PFAS manufacturing facility;

    f.   Estimated half-life of PFOA in human blood;

    g.   Methods by which a PFAS manufacturing facility might reduce employee exposure to PFOA;

    h.   Proposed PFOA exposure limits. Notably, upon information and belief, such meeting and associated discoveries resulted in the transfer and/or termination of certain pregnant employees who had been exposed to PFOA;

79.     A memo summarizing this meeting provided, *inter alia*:

a. "The review was held with Besperka, Bennett, Riddick, Gleason, **Hegenbarth**, Serenbetz, Raines, Kennedy, Von Schriltz, and Ingalls in attendance";

b. "There was agreement that a departmental position needed to be developed concerning the continuation of work directed at elimination of [PFOA][3] exposures off plant as well as to our customers and the communities in which they operate";

c. "There was consensus reached that the issue which will decide future action is one of corporate image, and corporate liability. Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation";

d. "Currently, none of the options developed are, from a fine powder business standpoint, economically attractive and would essentially put the long-term viability of this business segment on the line";

e. "Looking ahead, legal and medical will most likely take a position of total elimination";

f. "The product group will take a position that the business cannot afford it";

g. "The end result, in my opinion, will be that we eliminate all [PFOA] emissions at our manufacturing sites in a way yet to be developed which does not economically penalize the business, and addresses the [PFOA] emission and exposures of our dispersion customers";

---

[3] Throughout the summary, PFOA is referred to as "C-8."

h.   "Some information which we just developed 5/21/84 is that detectible levels of [PFOA] are in both the Lubeck, W.V. and the Little Hocking, Ohio water systems";

i.   "With the development of our current fine powder expansion plan, which takes capacity up to 8.2 MMAP, through a combination of equipment and recipe changes, [PFOA] air emissions will rise from the current 12,000 lbs. / yr. to 25,200 lbs. / yr.  The increase for the combined divisions will increase from a current 16,000 to 25,200 lbs. / yr. or a net 9,200 lbs. due to a 4,000 lb. offset with the implementation of the TBSA program.  This will increase further with the installation of the third dryer (12 MMAP fine powder) to about 37,000 lbs. / yr.";

j.   "[PFOA] will now become a major issue on all further project work in the fine powder area, starting with the Wilmington Scope Review 6/29/84.   In preparation for that review I have requested the ESO ground level concentration study be redone using the new production volumes and recipe (45% solids). Also we have included in the draft scope of work a new small exhaust system in the front end of the dryer bed to try to catch most of the [PFOA] in a much lower volume air stream.  The project will put this stream to the exhaust stack. The intent is to first reduce in plant exposure, and second leave a future capability for treatment of this relatively concentrated stream."

k.   "I believe we need to sit back down with the new information we now have, and the feedback we have gotten from these meetings and jointly with Putnam

review our plant position.  Raines at one point had rejected reduction as an option.  This needs to be included in our thinking again."

80.    By no later than June 14, 1984, the PFAS industry was aware that the average biological half-life of PFOA in human blood was approximately 2.4 years, but with considerable variability between individuals, and that male operators in at least one PFAS manufacturing facility complained about difficulty in achieving pregnancy with their wives.

81.    By 1986, a cancer morbidity study among employees exposed to PFAS showed male hourly wage workers had an incidence of bladder cancer deaths at more than double what would have been expected.

82.    By 1987, a study conducted of at least one plant where fluorochemicals were used found increases above expected rates of death from female breast cancer, bladder cancer, Hodgkin's lymphoma, lung cancer, urinary cancers in men, and cirrhosis of the liver in women.

83.    By 1988 at the latest, the PFAS industry was aware that PFOA was associated with increased rates of carcinogenicity in rats, including testicular cancer.

84.    In 1989, a study of cancer incidence among employees at a PFAS manufacturing facility detected an increased incidence of leukemia, buccal cavity and pharynx cancer, kidney and other urinary cancers, including bladder cancer and multiple myeloma.

85.    By 1989, the PFAS industry was aware that there were increases in other cancers in employees at PFAS manufacturing facilities as well, including pancreatic, lung, kidney, and bladder cancers and Hodgkin's lymphoma.

86.    Upon information and belief, on or about 1989, Hegenbarth was transferred to Gore to head a broad range of Gore research, development, and manufacturing activities, and in particular the management of many Gore issues involving C8.

87.     With Hegenbarth's transfer, beyond continuing to operate as a purchaser and processor of products containing APFO/PFOA, Hegenbarth spearheaded efforts enabling Gore to polymerize PTFE using APFO.

88.     Upon information and belief, due to his intimate familiarity with the toxic and otherwise harmful nature of PFOA gained by Hegenbarth while working as an employee and executive within the PFAS industry, Hegenbarth was ideally suited to manage imminent PFOA-related issues in Gore's new production projects.

89.     Hegenbarth assembled his team at Gore Cherry Hill with former colleagues and fellow leaders in the PFAS industry, including Patty McGuigan ("McGuigan"), a world-renowned expert in surfactants and surface chemistry. She worked with Hegenbarth directly during Hegenbarth's early years at Cherry Hill and through 1994.

90.     In or about March 1996, Richard Baillie ("Baillie"), who previously worked with Hegenbarth in an executive role at a different PFAS manufacturing facility, where he was present during multiple executive meetings and gained actual knowledge of the toxic nature of PFOA, also joined Hegenbarth's team at Gore Cherry Hill.

91.     Prior to joining Gore, Richard Baillie was copied on a September 28, 1994 memorandum regarding "C8 Ammonium Perfluorooctanoate Fluorosurfactant Strategies and Plans." He was instructed to return the draft copy for destruction after he read it. He was instructed to work with other suppliers and others, and "use outside resources to leverage efforts." He was also instructed to "Initiate C-8 recycle and recovery from U.S. Gore".  Attached to the memorandum was a copy of Roger Zipfel's September 15, 1994 report ("The Zipfel Report").

92.     The Zipfel Report, Appendix E, documented liver changes in rats exposed to inhalation of C8, and testicular cancer.  Appendix E stated "[t]he concern around the long term effects of ammonium perfluorooctanoate is related to its persistence in human blood".  Appendix E also noted a possible increase in prostate cancers related to APFO.

93.     Upon information and belief, due to Baillie's intimate familiarity with the toxic and otherwise harmful nature of PFOA, he was seen to be ideally suited to manage imminent PFOA-related issues and served a "key role" at Gore.

94.     By 1990, the PFAS industry was aware that there was a statistically significant excess of deaths among workers exposed to PFAS due to urinary cancers, a statistically significant increased incidence of bladder cancer in male employees, a statistically significant increase in mortality from cancer of the digestive organs among female employees, and female employees continued to have a statistically significant elevation in the incidence of cirrhosis of the liver. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

95.     A 1990 internal industrial hygiene data review demonstrated a correlation between PFOA levels in the air and PFOA blood levels in workers who inhaled contaminated air. It was found that levels in blood were an order of magnitude higher than the levels in the air, which demonstrated that PFOA bioaccumulated inside the human body. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

96.     In a report dated April 12, 1990, entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma," which reviewed data derived from an animal study, the authors concluded that the induction of Leydig cell adenoma (testicular tumors)

related to PFOA exposure was likely to be hormonally mediated. Upon information and belief, such findings were known to Hegenbarth and Gore.

97.    By October of 1990, the PFAS industry was aware that PFOA induced a dose-related decrease in serum testosterone, which appeared to document a direct effect of PFOA on the testes. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

98.    A memo authored by PFAS industry employees dated March 15, 1991, reported on a meeting at which employees decided that "[a] warning of potential C-8 hazards (especially from condensate) should be included in material safety data sheet (MSDS) for all products in which C-8 concentration is 0.1% or more." The memo also indicates that all other "product literature which contains safety or health warnings should be revised to be consistent with MSDS." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

99.    In the unpublished 1992 thesis of Frank Gilliland, MD, who studied the clinical pathology parameters of 111 male workers at a PFAS manufacturing facility in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone (also an adverse effect) with this association being stronger in older men. Dr. Gilliland concluded that PFOA may affect male reproductive hormones. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

100.    Dr. Gilliland's 1992 unpublished thesis from his worker study also showed thyroid effects in production workers that were associated with organofluorine concentrations in worker blood serum. A positive correlation was seen between organic fluorine and the thyroid

stimulating hormone in serum, a sign of thyroid deficiency. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

101.   PFAS manufactures learned that doses as low as 300 ppm PFOA caused statistically significant increases in adenomas and carcinoma of the liver and pancreas, and Leydig cell adenomas in the testis. By 1993, the PFAS industry was aware of two animal studies that found that PFOA caused testicular cancer and cancer at three different anatomical sites among laboratory animals exposed to PFOA. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

102.   By 1993, the PFAS industry also knew that a mortality study of PFAS production workers showing a 3-fold excess occurrence of prostate cancer in workers employed more than ten years. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

103.   In 1995, the UK company Imperial Chemical Industries strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors.   However, other PFAS industry representatives disagreed. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

104.   By 1996, the PFAS industry was aware that certain testing linked PFOA to DNA damage. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

105.   In or about 1996, certain PFAS manufacturers jointly commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical. By November of 1998, the monkeys in this study were suffering from severe health effects. By 1999, even the

monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that no observable effect level (NOEL) could not be found in non-human primates. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

106.   As of January of 1997, the PFAS industry was aware of a hormonally-mediated mechanism for the Leydig cell tumors in rat testes. In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1," Lisa B. Biegel, Ph.D., Senior Research toxicologist at the DuPont Haskell Laboratory, wrote: "[t]he studies summarized below support a hormonally-mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates serum estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation. . . . The mechanism of tumorigenesis is not completely understood, and therefore relevance to humans cannot be completely ruled out. However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

107.   A paper published in 1997 by John C. Cook and Eric D. Clegg, concluded: "[o]ccurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and] . . . it should be assumed that humans are potentially susceptible." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

108.    On April 27, 1998, Lisa Walton, of W.L. Gore wrote to Roger Zipfel inquiring, by information and belief, as to how Gore could introduce a process that would effectively remove APFO vapors from air emissions. By information and belief, Gore also subsequently sought to determine how to utilize liquid waste treatment methodology in order to treat the APFO Gore was routinely dumping.

109.    At the time of Lisa Walton's letter, PFOA in its particulate form was being emitted in high volumes from smokestacks, with no, or with insufficient mechanisms and destruction capacities to effectively remove the large quantities of APFO being processed at the Cherry Hilly Facility. The emissions were deposited in soil and water sources throughout the surrounding communities.

110.    In 1999, calculations by a PFAS industry employee showed that a "general population member with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to life-time accumulation. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

111.    In April of 2000, a PFAS manufacturer rejected its own occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products." Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

112.    In or about 2000, the EPA notified a PFAS manufacturer that it intended to pursue more rigorous regulation of the perfluorinated chemicals it manufactured. Shortly thereafter, that PFAS manufacturer publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA. Two of the

reasons cited for the manufacturer's decision were PFOA's (1) bio-persistence and (2) toxicity. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

113.   On or about February 23, 1999, Elizabeth B. "Betsy" Downs ("Ms. Downs"), an employee at Gore, who lived directly across from the Gore Cherry Hill Facility, at 2416 Singerly Road, Elkton MD 21921-000 died of cancer-related complications.

114.   Upon information and belief, aqueous PFOA emissions from the Cherry Hill Facility contaminated the well on Ms. Downs' property, which was located near Cherry Hill.

115.   In or about July 19, 2000, Gore, with knowledge of PFOA contamination at the site, purchased the home of its former employee, Betsy Downs, and subsequently razed the property to the ground.

116.   In October of 2001, Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled "A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (APFO) Exposure to Estimates of Perfluorooctanoate (PFO-) Blood Levels in Humans." The paper described calculations which showed that ingestion of 1 ppb of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

117.   In March of 2002, a PFAS manufacturer's website titled "C-8 INFORM" continued to state that PFOA had no adverse health effects and misrepresent the decades of studies and scientific data related to health effects associated with C8 exposure.

118.   By 2003, the PFAS industry was aware of at least one mortality study and a mortality registry of workers exposed to PFAS, which reported excess bladder cancer incidence

with high exposure jobs and an excess of kidney cancer deaths over expected levels, respectively. Upon information and belief, such findings was known to Hegenbarth, Baillie and Gore.

119.   Richard Baillie and Lisa Walton of W.L. Gore were members of an organization called the Fluoropolymers Manufacturers Group ("FMG") of the Society of the Plastics Industry, Inc., ("SPI"), with Richard Baillie serving as the group's Chairman in 2003.

120.   Membership criteria required each member either be (1) a processor of APFO-containing dispersion resins or (2) a compounder of APFO-containing dispersions and resins.

121.   On March 14, 2003, FMG, wrote the U.S. Environmental Protection Agency (EPA) providing information about uses of fluoropolymers made with perfluorooctanoic surfactants. The EPA was concerned about the data provided to the EPA on PFOA, and the fact that PFOA was detected in the human blood in the general population.

122.   On October 31, 2003, the group changed its name to Fluoropolymers Processors Group ("FPG").

123.   An email of the October 31, 2003 meeting minutes from FMG discussed the FMG Mass Balance Program, in which participating companies would participate in a written survey about processes associated with dispersion and Barr would subsequently perform a sample collection at the responding facility. Richard Baillie and Lisa Walton of W.L. Gore were copied on the memo of the October 31, 2003 meeting minutes, which was attached to the email.

124.   In January of 2005, a final draft, titled "Dispersion Processor Material Balance Project", prepared by Barr Engineering Company, KHA Consulting LLLC, Keller and Heckman LLP, was circulated ("Barr Report"). By information and belief this report was finalized in February of 2005. By information and belief prior drafts of this report were circulated and distributed to FMG, and reviewed by Gore executives, including, but not limited to Richard

Baillie and Lisa Walton, prior to the January 2005 final draft, and a draft existed with findings in December 2004.

125. The Barr Report itself said "The number who agreed to participate was such that all could be accepted into the Study."

126. On December 21, 2004, Gore purchased multiple parcels of land surrounding the Cherry Hill facility, including two parcels on Leeds Rd, Elkton MD 21921-000, and 10.07 acres of land on Singerly Rd., Elkton MD 21921-0000. By information and belief this was in response to Gore's knowledge that the Barr Report would publish information related to the environmental contamination caused by APFO emissions.

127. In the Barr Report it was stated that, "[t]he FMG decided to study this group of processors because AFD were known to contain small amounts of PFOA salt known as ammonium perfluorooctanoate (APFO)." The Barr Report found that based on the results of sampling an analysis 62% of the APFO from AFD is destroyed and approximately 25% ends up in the air, water, and solid waste streams.

128. Shortly after the final Barr Report was published, on March 8, 2005, Gore purchased additional property near the Gore Cherry Hill Facility, including, but not limited Milburn Farm Orchards. The Milburn Farm Orchards was subsequently razed to the ground.

129. In 2006, the EPA reached a settlement agreement with a PFAS manufacturer to resolve the manufacturer's alleged reporting violations under the Toxic Substances Control Act regarding its fluorochemicals. The agreement did not require the manufacturer to admit to the violations, but the company agreed to pay a penalty in excess of $1.5 Million for 244 separate alleged violations. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

130.   In 2009, a follow-up study of workers exposed to PFOA showed an increase in prostate cancer incidence in workers with moderate to high exposures. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

131.   Toxicology studies show that PFOA is readily absorbed after ingestion or inhalation exposure. PFOA has an elimination half-life in the human body of 2 to 9 years. PFOA binds to albumen in the blood serum and is concentrated in the liver and kidneys. Indeed, PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

132.   PFOA is associated in the medical literature with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer, and ovarian cancer, as well as thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions. Studies of PFOA exposure in animals have shown the ability to cause other cancers not yet associated with human exposure. The EPA has also advised that exposure to PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

133.   In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans." These health conditions can arise months or years after exposure to PFOA. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

### Gore's Knowledge of PFOA Environmental Contamination

134.   By the early 1960s, the PFAS industry understood that groundwater near waste disposal sites would be contaminated with PFAS. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

135.   By 1966, the PFAS industry was aware that PFAS, including PFOA, move rapidly in groundwater and migrate into nearby bodies of water. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

136.   By the mid-1970s to early 1980s, the PFAS industry was also aware of certain groundwater and surface water sources located near PFAS manufacturing facilities that were contaminated with PFAS. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

137.   By 1984, the PFAS industry was aware that PFOA in particulate form exhausted from stacks at PFAS manufacturing facilities would be carried by the wind well beyond the plant property line and deposited in the soil throughout the community. The PFAS industry also learned that drinking water supplies in communities around manufacturing plants processing and utilizing PTFE products containing APFO were contaminated with PFOA (1) from air emissions of APFO from the plant and subsequently, deposited on ground, dissolved in rainwater and then percolated into the groundwater and (2) from direct discharges of liquids containing PFOA into the Ohio River. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

138.   By 1984, the PFAS industry was aware that PFOA was present in the public drinking water supply in areas located near PFAS manufacturing facilities. Samples of tap water reported to be from public drinking water supplies near those facilities found that PFOA was

present in drinking water samples collected. Upon information and belief, this decision was shared with Hegenbarth, Baillie and Gore.

139.   Despite this knowledge, the PFAS industry chose not to alert the public at large. Despite this knowledge, the PFAS industry, including Gore chose not to alert the public or Plaintiffs.

140.   By June of 1984, the PFAS industry was aware that water supplied by a town located "up-river" from a PFAS manufacturing plant, contained PFOA levels of at least 500 ppt. Because of the location of the contaminated wells in in regard to the facility and the direction of flow of the river, manufacturer knew that this contamination was caused by PFOA released into the air from its manufacturing facility. Upon information and belief, such findings was known to Hegenbarth, Baillie and Gore.

141.   By 1985, the PFAS industry was aware that PFOA was leaching into groundwater beneath digestion ponds that had previously been used to dispose of PFOA-contaminated sludge and was migrating through the groundwater under the plant into the public drinking water supply where PFOA levels were detected as high as 1,500 ppt. These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988. Upon information and belief, such findings were known to Hegenbarth, Baillie and Gore.

142.   By 1987, air modeling documented PFOA in the ambient air beyond the fence line of a PFAS manufacturing facility that resulted from emissions drifting with the wind into nearby communities. Upon information and belief, such findings was known with Hegenbarth, Baillie and Gore.

143.   Upon information and belief, PFAS manufacturers and Gore shared information about the environmental contamination potential of PFAS such as PFOA and PFOS from as far back as the 1980s and the information alleged to be known by one was made known to the other.

### PFOA Drinking Water Limits

144.   In 2009, the EPA identified PFOA, among other PFAS,  as an emerging contaminant of concern and issued a provisional health advisory stating that short-term (weeks to months) exposure to PFOA at a concentration of 400 ppt can cause human health effects. The provisional health advisory stated that the discovery of PFOA in drinking water above the advisory level should result in the discontinued use of the water for drinking or cooking.

145.   In May 2016, the EPA replaced its 2009 provisional health advisory with a new lifetime health advisory level (HAL). The 2016 HAL established that the presence of PFOA in drinking water at a concentration greater than 70 ppt should require water systems to undertake remediation and public health officials to promptly notify consumers about the health risks associated with exposure to PFOA. EPA health advisories are non-enforceable on the states.

146.   The EPA also established a Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by the EPA as an "estimate (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime."[4]

147.   One June 15, 2022, the EPA announced a new interim lifetime drinking water HAL for PFOA of 0.004 ppt.

148.   EPA's new interim HAL for PFOA is based on human studies finding associations

---

[4] United States EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 4-1 (May 2016).

between exposure to PFOA and/or PFOS and effects on the immune system, human development, and cancer, and will be in place until EPA's PFAS National Primary Drinking Water Regulation is in effect.

149.    In the absence of federally enforceable standards for PFAS, several states have developed draft, proposed, or final health based regulatory or guidance levels for PFAS.

150.    In 2016, Vermont established a drinking water advisory of 0.02 ppb (20 ppt).

151.    The State of Vermont's Department of Public Health has adopted a standard of MCLs of 20 ppt for both PFOA and PFOS, and warns residents "PFAS could be taken up by vegetables. Do not boil water. Boiling water will not remove PFAS and may concentrate them". [5]

152.    In May 2017, Minnesota established a health guidance value for PFOA in drinking water of 0.035 ppb (35 ppt).

153.    In November of 2017, New Jersey announced it will adopt a new health-based Maximum Contaminant Level (MCL) for PFOA in drinking water of 14 ppt, a decrease from its previously set guidance level of 40 ppt based upon the recommendation of the New Jersey Drinking Water Quality Institute, which was based upon the latest research on the adverse health effects of PFOA.

154.    On December 18, 2018, the New York State Drinking Water Quality Council recommended that the State's Department of Health adopt MCLs of 10 ppt for both PFOA and PFOS.

155.    In 2021, Illinois established a preliminary health-based guidance value for PFOA of 2 ppt.

---

[5] https://www.healthvermont.gov/sites/default/files/documents/pdf/ENV_DW_PFAS.pdf

156.     In 2021, Michigan set a MCL for PFOA in drinking water of 8 ppt.

157.     The State of Maryland has applied the EPA's HAL for PFOA and PFOS in drinking water.

158.     In 2020, Maryland began sampling public water treatment systems to identify water systems with levels of PFOA and PFOS exceeding the EPA's HAL. The state has continued its sampling using a phased approach and has worked with water systems with exceedances of PFOA and/or PFOS to take affected water systems offline, collect additional samples, and issue public notices.

159.     Maryland has also set an advisory level for another PFAS compound, PFHxS, in drinking water and site-specific fish consumption advisories for PFOS.

160.     The website for Maryland's Department of the Environment ("MDE") describes PFAS, including PFOA, as chemicals that "are persistent in the environment and the human body, meaning they do not break down easily and accumulate over time".  In general, animal studies have found that animals exposed to PFAS at high levels resulted in changes in the function of the liver, thyroid, pancreas and hormone levels.

161.     MDE has published on its website that, "According to the Agency for Toxic and Disease Registry (ATSDR) some, but not all, studies in humans with PFAS exposure have shown that certain PFAS may: affect growth, learning and behavior of infants and older children, lower a woman's chance of getting pregnant, interfere with the body's nature hormones, increase cholesterol levels, affect the immune system, [and] increase the risk of cancer."

### *Gore PTFE Processing at Cherry Hill*

162.   Gore regularly processed large quantities of PTFE, and aqueous PTFE dispersion, heavily contaminated with C8 at its Cherry Hill Facility ("Cherry Hill"), in Elkton, Maryland.

163.   The majority of PTFE processing at Cherry Hill involved the large-scale conversion of PTFE fine powders (which were contaminated with C8) into PTFE and PTFE membrane.

164.   Upon information and belief, at all times relevant to the facts and allegations set forth herein, the vast majority of Gore's worldwide wet PTFE paste processing occurred at Cherry Hill and was directly carried out by approximately two hundred (200) Gore employees.

165.   PTFE paste processing transformed PTFE fine powder into extremely strong networks of web-like, interconnected PTFE fibers known as "ePTFE."

166.   Such paste processing began with PTFE fine powder, which was: (a) blended with a measured amount of lubricant; (b) compressed into pellets; (c) heated; (d) extruded into tape; (e) calendared into rolls; and (f) dried at high temperatures.

167.   The result of such PTFE processing was a range of complex products, including but not limited to Gore-Tex products.

168.   Gore also engaged in an ePTFE sintering process, which involved high temperature heat treatment and/or melting of ePTFE membranes to ensure their molecular stability.

169.   Such machines heated up large quantities of PTFE ranging up to  thousands of pounds of material per hour.

170.   Dr. Sutton was expressly informed by Gore that the expansion/sintering process was safe, and the venting of such machines was safe because the ePTFE polymer itself was inert (non-toxic).

171.   Upon information and belief, Gore knew that such ePTFE polymer contained toxic PFOA residuals which were substantially certain to injure Dr. Sutton and others who were exposed.

172.   "Extrusion" is a process in which material is fed through a hopper into an extruder, essentially a rotating screw surrounded by a heated barrel, where it is mixed, and pumped through a die. The die gives the part its shape. At Gore, extrusion specific to PTFE is based upon ram extrusion, coming out as a tape.

173.   Over time, Gore developed multiple extruders for its ePTFE polymer, containing toxic PFOA residuals. In the fall of 1996, another new extruder, named "T-Rex," was built at Cherry Hill.

174.   Upon information and belief, T-Rex was the largest PTFE paste extruder ever built.

175.   Upon information and belief, before T-Rex, Gore processing was capable of producing approximately ten (10) million pounds of ePTFE per year.

176.   Upon information and belief, T-Rex increased Gore's extrusion capability to approximately forty (40) million pounds of ePTFE per year.

177.   Aside from T-Rex, Gore processed tens of millions of pounds a year, on various extruders of many different sizes, such as the 2069 four (4) inch extruder.

178.   On or about December of 1993, Bill Mortimer ("Mortimer"), began to head Gore's experimentation with "filled products."

179.   "Filled products" were combinations or blends of traditional PTFE and other materials, such as platinum powder and nickel.

180.   Combining such materials changed the properties of the chemical compounds and expanded the potential uses of PTFE.

181.   Mortimer's experiments revealed that blending PTFE with such other materials created filled products which displayed remarkably unique properties.

182.   Mortimer, at the behest of Gore, increased the overall manufacturing capabilities of Gore's Filled Products Division. Moreover, in examining Mortimer's production facility there existed:

  a.   PTFE sludge on the floor which, upon information and belief, contained approximately 1-2% PFOA;

  b.   APFO-filled post-coagulation wastewater being directly discharged into the county sewer system; and

  c.   Post-coagulation resin being dried on racks in large, walk-in ovens, emitting extreme amounts of PFOA vapor directly into the atmosphere.

183.   On or around May of 1990, Mortimer and Hegenbarth, at the direction of Gore began assessing the manufacturing capabilities of the Filled Products Division.

184.   As the Filled Products Division began performing testing trials, it began crafting instrumentation capable of performing extrusions with filled products.

185.   This process included manual filled products extrusions, which involved extruding PTFE co-coagulated from raw, heavily PFOA-contaminated dispersion mixed with various powders.

186.   Such extrusion also involved heating of associated materials to elevated temperatures, which caused constant smoking of highly contaminated lubricant.

187.   In continuing to experiment with filled products extrusions, Gore also purchased a servo-hydraulic system from MTS, located in Minneapolis, Minnesota.

188.   The servo-hydraulic system was used in the rheology lab and due to the extrudate and lubricant, the rheology lab became highly contaminated with PFOA.

189.   In or around the same time, Gore began the "Snowstorm Project."

190.   The Snowstorm Project involved blending and/or combining different batches of PTFE resins, creating PTFE compounds with unique properties.

191.   Throughout the Snowstorm Project, Gore performed mandatory, routine blood testing on employees on the Snowstorm team.

192.   Moreover, upon information and belief, Gore relocated certain pregnant employees away from the Snowstorm process area. This practice occurred in various operations in which pregnant employees were terminated or relocated.

193.   At all times relative to the facts and allegations set forth herein, Gore informed employees, including Dr. Sutton, that PFOA was inert (non-toxic).

194.   Pursuant to the 1984 Memo, dielectric drying was used for its potential benefit in PFOA recovery.

195.   Upon information and belief, Cherry Hill was targeted at finding ways to make PTFE fine powder while minimizing PFOA emissions, based on Gore's knowledge of PFOA's high toxicity, consistent with the goals of the 1984 Memo.

196.   There were two unlined ponds located at the Gore Cherry Hill facility.   By information and belief, Gore was generating large amounts of effluent, which comprised large quantities of APFO, and dumping that effluent into either the 1) wastewater treatment system; or 2) the unlined ponds.

197.   At a subsequent point, Gore dug up the soil from the ponds, paved over the ponds, and built a structure over top (parking lot). Gore then added a third pond with concrete lining.

198.   In sum, upon information and belief, both the Snowstorm Project and the Filled Products Division resulted in:

a.   Dumping large quantities of PFOA-laden wastewater into groundwater that supplies drinking water in wells, and into the public sewage system;

b.   Emitting large quantities of PFOA vapors into the atmosphere during the drying process.

## FACTS RELATED TO PLAINTIFFS

199.   Dr. Stephen Sutton was employed by Gore as a rheologist, at the Cherry Hill facility, located in Elkton, MD in June of 1993.

200.   Prior to his employment, Gore required Dr. Sutton to submit to a cholesterol test. Upon information and belief, Gore required all new employees to be tested for cholesterol. Dr. Sutton was also administered a vector EKG.

201.   Upon information and belief, Gore's knowledge of PFOA's link to heightened cholesterol led them to screen the cholesterol levels of all new employees expected to work closely with PFOA.

202.   In 1994, Plaintiffs Dr. Sutton and Mrs. Sutton moved to 155 Avalon Avenue, Elkton, MD 21921 ("the Sutton Home"), located approximately 1 mile from the Gore Cherry Hill facility, in the Manchester Park community.

203.   Prior to choosing the location of their home, Jack Hegenbarth and Dan Hubis, a supervisor at Gore (sponsor title), took particular interest in providing guidance and assistance to the Suttons in selecting the location of their new home. Both specifically discouraged Dr. Sutton from purchasing a home close to the Cherry Hill Facility. Upon learning of the Suttons' decision to purchase the Sutton Home, both Hegenbarth and Hubis implored them to reconsider,

asking them to "give it some thought" and assuring that they could help find "something better" for the Suttons.

204.   Upon information and belief, such discouragement and warning were based on Hegenbarth and Hubis' knowledge of the mass aqueous and aerial PFOA emissions from Cherry Hill into the surrounding environment. Not knowing that such statements were based on toxic emissions from Cherry Hill, Dr. and Mrs. Sutton purchased a home approximately one (1) mile from Cherry Hill.

205.   In 1993, Mrs. Sutton became pregnant with Thomas Sutton, and lived throughout her pregnancy at 155 Avalon Avenue, Elkton, MD 21921.

206.   Thomas Sutton was born on February 27, 1998, and brought home to 155 Avalon Avenue, Elkton, MD 21921, where he lived for the first approximate six years of his life.

207.   The Suttons lived at 155 Avalon Avenue, Elkton, MD 21921 location until 2004.

208.   During the time that the Suttons lived at 155 Avalon Avenue, Elkton, MD 21921, they were exposed daily to PFOA from the Gore Cherry Hill facility. The Suttons had multiple forms of exposure to PFOA from Gore, including, but not limited to ingestion and dermal exposure from contaminated drinking water, inhalation of contaminated outdoor air, and consumption of fruits and vegetables from contaminated soil.

209.   The water supply that the Suttons used to drink, bathe in, cook with, and use for all of their other water needs, was provided by water supply wells that withdrew water from the fractured bedrock aquifer beneath it. The aquifer was recharged by local precipitation.

210.   The dissolved APFO contaminants migrated into the subsurface, through the unsaturated soil zone with precipitation, and into the water-bearing zone of the community wells utilized by the Suttons' community.

211.   During the time period Dr. Sutton worked for Gore, and the Suttons lived at 155 Avalon Ave., the Suttons drank, bathed in, cooked with, and watered their lawn with, and otherwise used the contaminated water on a regular basis.

212.   During the time period Dr. Sutton worked for Gore, and the Suttons lived at 155 Avalon Ave., Dr. Sutton and Mrs. Sutton bathed their baby, Thomas Sutton, in this water, and mixed his baby formula with the same contaminated water. During the time period Dr. Sutton worked for Gore, and the Suttons lived at 155 Avalon Ave., the Suttons purchased and consumed fruit from Milburn Farms, an orchard which was then located directly east of the Gore Cherry Hill Facility.

213.   In February of 2019, Dr. and Mrs. Sutton viewed the documentary "The Devil We Know". Upon watching the documentary, Dr. Sutton began to comprehend the hazards and toxic nature associated with he and his family's PFOA exposure. As the Dr. Sutton began to consider the processing operations at Gore, in light of his new-found knowledge regarding the toxicity of PFOA, he realized that he and his family had been subjected to approximately a decade of toxic exposures at their home close to the Gore facility.

## DAMAGES

214.   As a proximate result of his exposure to PFOA released from Gore at the Cherry Hill facility, Dr. Sutton developed and suffered from health conditions, including, but not limited to: kidney cancer, high cholesterol, gout, neurological effects, seizures/migraine variant, nightmares, weight loss, insomnia, depression, and PTSD related to his realization that many of his neighbors and members of his surrounding community were exposed to PFOA from Gore with devastating health consequences, including death.

215.   As a proximate result of his exposure to PFOA released from Gore at the Cherry

Hill facility, Dr. Sutton is at risk for development of additional health conditions in the future, up to, and including death.

216.    As a proximate result of his exposure to PFOA released from Gore at the Cherry Hill facility, Dr. Sutton has incurred damages for past and present medical care, and will require future medical care, including lifelong health monitoring.

217.    As a proximate result of her exposure to PFOA released from Gore at the Cherry Hill facility, Mrs. Sutton developed and suffered from health conditions, including, but not limited to endometrial cancer, breast cancer, hypertension, colon polyps, bladder urothelial dysplasia, and thyroid modules.

218.    As a proximate result of her exposure to PFOA released from Gore at the Cherry Hill facility, Mrs. Sutton has incurred damages for past and present medical care, and is at risk for development of additional health conditions in the future, up to, and including death.

219.    As a proximate result of her exposure to PFOA released from Gore at the Cherry Hill facility, Mrs. Sutton will require future medical care, including lifelong health monitoring.

220.    As a proximate result of his exposure to PFOA released from Gore at the Cherry Hill facility, Thomas Sutton is at risk for development of additional health conditions in the future.

221.    As a proximate result of his exposure to PFOA released from Gore at the Cherry Hill facility, Thomas Sutton will require future medical care, including lifelong health monitoring.

## COUNT I
## STRICT PRODUCTS LIABILITY –
## ABNORMALLY DANGEROUS ACTIVITY

222.    Plaintiffs incorporate by reference the allegations above as if fully  stated herein.

223.    This Claim is brought under Maryland law.

224.    Defendant Gore's manufacturing processes and negligent, reckless, and/or

intentional handling of PFOA solution, APFO, and/or PFOA constituted an abnormally dangerous activity for which Defendant is strictly liable.

225.    Defendant Gore's use and disposal of PFOA solution, APFO, PFOA, or other waste containing PFOA, as described herein, was inappropriate to the place where it was carried out, especially given the close proximity of the Cherry Hill Plant to Maryland residents, schools, neighborhoods, churches and other retail establishments, and to sources of drinking water relied upon by residents of Elkton and those utilizing its schools, neighborhoods, churches and other retail establishments.

226.    Furthermore, Defendant Gore's use and disposal of PFOA, and reckless disregard for the consequences of those actions, carried a high degree of risk of harm to others and a likelihood that any such harm would be great.

227.    As a result of Defendant Gore's abnormally dangerous activities, Plaintiffs have suffered harm to their property and have suffered and continue to suffer injuries to their bodies and have been forced to mitigate damages as set forth herein, as well as below.

## COUNT II
## NEGLIGENCE

228.    Plaintiffs incorporate by reference the allegations above as if fully stated herein.

229.    This Claim is brought under Maryland law.

230.    Defendant Gore knew or should have known that PFOA, APFO, and PTFE dispersions containing PFOA that were used in the manufacturing process at Defendant's facility would result in the release of PFOA and APFO into the environment, the contamination of the groundwater, ingestion of the groundwater by the community of Cherry Hill, accumulation of PFOA and APFO in the bodies of members of that community, including Plaintiffs, and adverse health effects to those people, including Plaintiffs.

231.    Defendant Gore knew or should have known that use of PFOA, APFO, and PFOA containing PTFE dispersions and/or the discharge of PFOA and APFO into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendant to take adequate safety precautions to ensure that PFOA and APFO were not released into the surrounding environment.

232.    Defendant Gore further knew or should have known that it was unsafe and/or unreasonably dangerous to emit large amounts of APFO which affected the air, water, and soil in and around the Gore Cherry Hill Plant and the Elkton, Maryland community.

233.    Defendant further knew or should have known that it was unsafe and/or unreasonably dangerous to use APFO aqueous dispersions and PTFE powders to make ePTFE films and other consumer products, which Defendants did since at least 1980

234.    Defendant further knew or should have known that the amount of APFO it emitted was unsafe and/or unreasonably dangerous to the Plaintiffs and the surrounding community.

235.    Defendant further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA and APFO to be emitted without adequate control measures.

236.    At some point in time after use of PFOA at the Cherry Hill Plant began, either based upon information provided by other PFAS manufacturers, or through published and available literature, Defendant Gore knew or should have known of the environmental risks and health hazards associated with exposure of human beings to PFOA and APFO.

237.    Defendant Gore had a duty to take all reasonable measures to ensure that PFOA, APFO, and/or any PFOA-containing PTFE dispersions would be effectively contained and not discharged into the surrounding environment.

238.    Defendant Gore further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relied upon by the residents of Elkton, including the Plaintiffs, and the surrounding area.

239.    Defendant Gore breached the above-stated duties by unreasonably disposing of PFOA and/or APFO in a manner that guaranteed PFOA would enter the environment, including the groundwater ingested by residents, including the Plaintiffs.

240.    Defendant Gore had a duty to warn users of the PFOA-containing products of the dangers of releasing PFOA into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFOA exposure, the propensity of PFOA to cause environmental contamination of air, soil and drinking water, and the bioaccumulation of PFOA in people who are exposed to PFOA.

241.    Defendant Gore further breached its continuing duties to warn about the dangers of PFOA learned after the purchase of PFOA and PFOA-containing products.

242.    Defendant Gore breached the above-stated duties by failing to adequately warn and provide sufficient instructions to foreseeable users of the products, including employees handling and disposing of them at the Cherry Hill Plant, to avoid discharging PFOA into the environment where it was likely to enter the groundwater and be ingested by residents such as the Plaintiffs.

243.    Had Defendant Gore provided adequate warnings and instructions of the known health hazards and risk of environmental contamination of PFOA and PFOA-containing products to users, governmental agencies and the public, it is more likely than not that Plaintiffs' injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiffs' exposure to PFOA.

244.    As a result of Defendant's breaches of the various duties set forth above, the drinking water in and around Elkton, Maryland became contaminated with unsafe levels of PFOA which was ingested by Plaintiffs.

245.    Upon information and belief, Defendant Gore was grossly negligent, acted with reckless indifference to the health and safety of the public, and/or failed to prevent PFOA from being released into the environment and failed to inform the Town of Elkton or the public of the potential that PFOA was contaminating its water supply.

246.    As a direct and proximate result of Defendant Gore's actions and omissions described herein, Plaintiffs have suffered illnesses and injuries caused by the accumulation of PFOA in their bodies, entitling them to economic and non-economic compensatory and consequential damages, including the past, present and future cost of medical care; lost earnings and diminished earnings capacity; the cost of medical monitoring; the loss of property value; and severe mental anguish and psychological distress.

## COUNT III – PUNITIVE DAMAGES
### OUTRAGEOUS, WILLFUL, WANTON, CONSCIOUS AND DELIBERATE CONDUCT WITH ACTUAL MALICE AND INTENTIONAL DISREGARD OF HARM

247.    Plaintiffs hereby incorporate by reference the allegations set forth above as if fully stated herein.

248.    This Claim is brought under Maryland law.

249.    The conduct of Defendant Gore as described above and herein was and is outrageous, willful and wanton.  The conduct of the Defendant Gore was undertaken with actual malice, and a conscious, deliberate and intentional disregard for Plaintiffs' lives.  This conduct was the direct and proximate cause of Plaintiffs' injuries and damages.

250.    Gore had actual knowledge, knew and fully understood of the toxicity and danger

to human life of APFO/PFOA at all times of its production and dispersion activities. Armed with that actual knowledge of the toxicity and danger of APFO/PFOA, for over a decade, they continued to utilize it in production and disperse it into the environment.

251.    Gore knew that their production and of PTFE and ePTFE required utilization and processing of the same involved APFO, and APFO dispersions, and that their processing operations included substantial air emissions of PFOA into Elkton and the surrounding community, including the Suttons, causing serious injuries to the individuals within it, yet intentionally, and in bad faith, chose to continue production of its hazardous substances, emitting hazardous substances into the community to incur substantial profit. Gore did this with conscious, deliberate, and intentional disregard for the serious harm to individuals in Elkton and the surrounding community, including the Suttons, and with conscious, deliberate and  intentional disregard for human life. Gore did so with the express "evil motive" to place profit above human life.

252.    Gore knew that dumping effluent from the production of PTFE and ePTFE utilizing APFO/PFOA would cause serious injury to individuals in the in Elkton and the surrounding community who consumed water from the wells therein, including the injuries and illnesses sustained by the Suttons and cause harm to individuals exposed. Gore did this with conscious, deliberate and intentional disregard for human life, and with the express "evil motive" to place profit above human life.

253.    Gore knew that medical monitoring was advised at the high levels of exposure it had subjected Plaintiffs to, and that informing Plaintiffs of their exposure could help prevent, identify and allow them to treat their injuries and illnesses so as to save their lives and/or prevent their illnesses from increasing in danger and severity. Despite this knowledge, Gore chose to

conceal their toxic environmental exposures for over a decade, rather than inform Plaintiffs so that Plaintiffs could take the appropriate health monitoring precautions. Gore did this with conscious, deliberate and intentional disregard for human life, and with the express "evil motive" to place profit above human life.

254.    Gore concealed the toxicity of APFO/PFOA, its use of the toxic substance in its processing operations of PTFE, ePTFE, its air emissions containing the toxic substances, its dumping of toxic substances, for over a decade, in order to defraud the victims of its punitive conduct, including Plaintiffs, so as to avoid financial responsibility, and worse, to avoid changing its profitable operations to prevent continued harm to human life.

255.    As a direct and proximate result of Defendant Gore's past and continuing, outrageous, willful, wanton, conscious, deliberate and intentional disregard for Plaintiffs' lives, Plaintiffs have suffered and continue to suffer damages as set forth herein.

## SPOUSAL DERIVATIVE CLAIM – ELIZABETH SUTTON

256.    Plaintiffs hereby incorporate by reference the allegations set forth above as if fully stated herein.

257.    At the time Plaintiff Dr. Sutton was diagnosed with his illness, he and Plaintiff Mrs. Sutton were husband and wife, resided together, and continue to reside together as husband and wife with all of the legal and natural consequences attendant to such marital status.

258.    By reason of the negligence, gross negligence, recklessness and intentional conduct of the Defendants, Plaintiff spouse Mrs. Sutton has been caused to lose comfort, companionship, society, services and consortium caused by the illnesses and injuries her spouse has suffered.

259.    By reason of the foregoing, Plaintiff spouse Mrs. Sutton has been damaged in an

amount that exceeds the jurisdictional limit of 28 U.S.C. §1332(a) and is entitled to compensation.

## SPOUSAL DERIVATIVE CLAIM – STEPHEN SUTTON

260.    Plaintiffs hereby incorporate by reference the allegations set forth as if fully stated herein.

261.    At the time Plaintiff Mrs. Sutton was diagnosed with his illness, she and Plaintiff Dr. Sutton were husband and wife, resided together and continue to reside together as husband and wife with all of the legal and natural consequences attendant to such marital status.

262.    By reason of negligence, gross negligence, recklessness and intentional conduct of Defendants, Plaintiff spouse Dr. Sutton has been caused to lose the comfort, companionship, society, services and consortium caused by the illnesses and injuries his spouse has suffered.

263.    By reason of the foregoing, Plaintiff spouse Dr. Sutton has been damaged in an amount that exceeds the jurisdictional limit of 28 U.S.C. §1332(a) and is entitled to compensation.

### *Equitable Tolling of Applicable Statute of Limitations*

264.    Plaintiffs first assert that their claims have been brought within the applicable statute of limitations and expressly deny that one or more of such claims have been barred by any statute of limitations.

265.    In the alternative, the running of any allegedly applicable statute of limitations has been tolled by an executed tolling agreement, tolling the applicable statute of limitations through June 15, 2022.

266.    In the alternative, the running of any allegedly applicable statute of limitations has been tolled by reason of Gore's fraudulent concealment and Gore is precluded by the doctrine of fraudulent concealment and/or the discovery rule from relying upon any such allegedly applicable statute of limitations.

267.     Specifically, Gore, through its affirmative representations and/or omissions, actively misled Plaintiffs and concealed from Plaintiffs the true risks associated with PFOA by, *inter alia*, maintaining that the PTFE used in its manufacturing processes was safe, non-toxic, and non-carcinogenic and concealing the toxic character, quality, and nature of its production and environmental emissions of PFOA- from Plaintiffs.

268.     Gore expressly advised Dr. Sutton that the expansion/sintering machines were safe because the ePTFE polymer itself was inert (non-toxic).

269.     Gore further expressly advised its employees that PTFE was wholly inert (non toxic).

270.     When Gore advised Dr. Sutton that ePTFE was inert, Gore knew that such ePTFE polymer contained toxic PFOA residuals which were substantially certain to injure Dr. Sutton, Mrs. Sutton, Thomas Sutton, and others who were environmentally exposed.

271.     Prior to on or about February 1, 2019, Plaintiffs had no knowledge of Gore's wrongdoing as alleged herein, and as a result of Gore's misleading representations and omissions, Plaintiffs were unable to recognize the validity of their claims within any allegedly applicable limitations period which would operate to bar one or more of Plaintiffs' claims.

272.     Plaintiffs' lack of knowledge regarding the toxic and otherwise harmful nature of PFOA and the levels of toxic and otherwise harmful PFOA contained within Gore's PTFE resin and final products was not attributable to Plaintiffs' own lack of reasonable due diligence, as the information requisite to possess such knowledge was closely guarded, non-public, and controlled exclusively by Gore and its suppliers.

273.     Gore knew that Plaintiffs did not possess such requisite information nor reasonable means to acquire such information.

274.   Importantly, Gore had the ability to spend and did spend enormous amounts of money in furtherance of their purpose of designing, developing, marketing, promoting, and/or distributing PTFE products and ePTFE products containing AFPO, and concealed the extent of their knowledge, notwithstanding the known risks to Gore employees involved in the manufacturing process and members of the Elkton, Maryland community surrounding the Cherry Hill Facility, including Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs request that Court enter judgment against Defendant as follows:

A.  A judgment against Gore finding that it is liable to Plaintiffs;

B.  Compensatory damages against all defendants in an amount that will fairly and adequately compensate Plaintiffs Dr. Stephen Sutton, Elizabeth Sutton and William Thomas Sutton for their personal injuries caused by their exposure to and ingestion of PFOA resulting from defendants' negligence, gross negligence, reckless and/or intentional conduct and defendants' defective production, in amount in excess of the jurisdictional limits of this Court pursuant to 28. U.S. C. § 1332(a);

C.   Consequential damages against Defendant Gore for the costs of medical monitoring and surveillance of Plaintiffs in the future made reasonably necessary by Defendant Gore's conduct in causing Plaintiffs to be exposed to, ingest and accumulate PFOA in their bodies in an amount in excess of the jurisdictional limits of this Court pursuant to 28 U.S.C. § 1332(a);

D.  Compensatory damages that will fairly and adequately compensate Plaintiffs Dr. Stephen Sutton and Elizabeth Sutton for their spousal derivative claims in an amount in excess of the jurisdictional limits of this Court pursuant to 28 U.S.C. § 1332(a);

E.  Punitive damages against Defendant Gore as a result of their intentional conduct which was undertaken with actual malice, with a conscious, deliberate and intentional disregard for Plaintiffs' lives, and which caused them harm;

F.   All appropriate medical monitoring costs in an amount to be determined at trial;

G.  All appropriate water, soil, and air quality testing for PFOA/APFO or other PFAS;

H.  All appropriate remediation costs for groundwater, surface water, and soil, in an amount to be determined at trial;

I.  An award of attorney's fees and costs, as permitted law;

J.  An award of pre-judgment and post-judgment interest, as provided by law;

K.  Leave to amend this Complaint to confirm to the evidence produced at trial; and

L.  For all other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper, whether compensatory, punitive or declaratory.

**DATED:**  June 15, 2022

BAIRD MANDALAS BROCKSTEDT FEDRICO & CARDEA, LLC

/s/ *Philip C. Federico*
Philip C. Federico,  Fed ID No. 01216
Chase T. Brockstedt (Motion to be admitted *pro hac vice* to follow)
Brent P. Ceryes, Fed ID No. 19192
Stephen A. Spence (Motion to be admitted *pro hac vice* to follow)

Catherine M. Cramer (Motion to be admitted *pro hac vice* to follow)
Matthew P. Legg, Fed ID No. 19904
Brian V. DeMott (Motion to be admitted *pro hac vice* to follow)
6225 Smith Avenue, Suite 200B
Baltimore, MD 21209
Tel: 410-421-7777
Fax:  410-554-3636
pfederico@bmbfclaw.com
chase@bmbfclaw.com
bceryes@bmbfclaw.com
sas@bmbfclaw.com
ccramer@bmbfclaw.com
mlegg@bmbfclaw.com
brian@bmbfclaw.com
*Attorneys for Plaintiffs*


MOTLEY RICE LLC

/s/
_____

T. David Hoyle  (Motion to be admitted *pro hac vice* to follow)
Rebecca A. Fonseca (Motion to be admitted *pro hac vice* to follow)
Kayla E. Lattimore (Motion to be admitted *pro hac vice* to follow)
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Tel: (843) 216-9000
Fax: (843) 216-9450
dhoyle@motleyrice.com
rfonseca@motleyrice.com
klattimore@motleyrice.com
*Attorneys for Plaintiffs*